# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

AMBER DOWDY, et al,,

                **Plaintiffs,**

vs.

THE COLEMAN COMPANY, INC.,

                **Defendant.**

**MEMORANDUM DECISION
AND ORDER**

**Case No.  1:11CV45DAK**

**Judge Dale A. Kimball**

      This matter is before the court on several motions: (1) The Coleman Company, Inc.'s Motion for Summary Judgment [Docket No. 63]; (2) The Coleman Company, Inc.'s Motion to Strike the Testimony and Opinions of Robert Engert [Docket No. 66]; (3) The Coleman Company, Inc.'s Motion to Strike the Testimony and Opinions of Gary Hutter [Docket No.69]; (4) Plaintiffs' Motion to Strike the Testimony and Opinions of Marchica and Deppa [Docket No. 82]; (5) Plaintiffs' Motion to Strike the Testimony and Opinions of Richard J. Roby [Docket No. 84]; and (6) Defendant's Motion to Strike Plaintiffs' Irrelevant and Inadmissible Exhibits Offered in Response to the Coleman Company, Inc.'s Motion for Summary Judgment and In opposition to The Coleman Company, Inc.'s Motions to Strike the Testimony and Opinions of Robert Engberg and Gary Hutter [Docket No. 98].  On August 1, 2012, the court held a hearing on the motions.  At the hearing, Plaintiffs were represented by Mark N. Stageberg and Jackson Howard, and Defendant was represented by Kenneth R. Lang and John R. Lund.  After hearing oral argument, the court took the motions under advisement.  The court has carefully considered the pleadings, memoranda, and exhibits submitted by the parties, as well as the law and facts

relevant to the motions.  Now being fully advised, the court renders the following Memorandum

Decision and Order.

## BACKGROUND

Plaintiff Amber Dowdy is the personal representative of the estate of Steven Dowdy, and

Plaintiffs Mark and Teresa Thomlinson, are the personal representatives of the estate of Darian

Thomlinson.  In June of 2009, Steven Dowdy, then age 28, and Darian Thomlinson, then age 10,

were camping with other friends and family members in Cache County, Utah.  Dowdy and

Thomlinson used a propane radiant heater and a propane lantern in their tent to stay warm while

they slept.  Tragically, Dowdy and Thomlison were found dead in their tents in the morning.

Autopsies showed very high levels of carbon monoxide in both victims.

The heater, lantern, and tent Dowdy and Thomlinson used that night were all designed,

manufactured, and sold by Defendant The Coleman Company, Inc.  In their Amended Complaint,

Plaintiffs alleged that the heater and/or lantern produced deadly amounts of carbon monoxide,

resulting in the deaths of Dowdy and Thomlinson.  After the close of discovery, however,

Plaintiffs have limited their product liability claims to only the heater, which was a Coleman

Powermate 5017 heater ("the heater").  The heater was owned by Paul Thomlinson and was

manufactured in 1996.

Plaintiffs' Amended Complaint alleges causes of action for strict products liability,

defective warnings and instructions, and negligence.  Specifically, Plaintiffs claim that the

heater's defective design made it unreasonably dangerous, that Coleman sold the heater with

inadequate warnings relating to carbon monoxide hazards, that Coleman negligently designed

and manufactured the heater, and that Coleman was negligent in its post-sale duties.  Plaintiffs

further contend that Coleman was fully aware that the heater produced large quantities of carbon

monoxide, was designed differently than other brands of heaters on the market, and that several campers using the heater or Coleman heaters similar to the heater in this case within enclosed areas had died over the years.

With respect to the heater's design, the parties dispute whether the heater should have incorporated an Oxygen Depletion Sensor ("ODS") and whether the heater should have had the thermocouple placed in front of the burner screen.  Plaintiffs' experts opine that if either of these elements had been incorporated into the heater's design, Dowdy and Thomlinson would not have died.  Plaintiffs also contend that Coleman engineering reports show that Coleman engineers knew of these alternate designs prior to manufacturing the heater in this case.  Coleman, however, asserts that the heater is certified under Canadian Gas Association standards, which does not require an ODS.  Coleman also argues that Plaintiffs' experts cannot identify any high pressure propane heater, like the one in this case, that included an ODS.  Plaintiffs assert that the Canadian Gas Association standards are irrelevant to this case and that, whether or not any other heaters incorporate an ODS, their experts have provided findings and opinions regarding safer alternative design including the use of an ODS.

Coleman further argues that Plaintiffs have not conducted testing demonstrating that placing a thermocouple in front of the burner face will serve as a low oxygen shut down device as Plaintiffs' experts suggest.  However, Plaintiffs contend that there are several manufacturers, which they have identified, who place the thermocouple in front of the burner screen and it is clear from the testing of those heaters that the thermocouple activates to shut down the heater when oxygen levels get low.  Plaintiffs assert that Coleman ran a series of tests in February 1990 that compared its competitors' heaters and the test results show that in every test of the Primus and Mr. Heater models, the heater would flame out (shut down) as oxygen levels declined and

before carbon monoxide levels reached dangerous levels.  There is a dispute between the parties

as to whether this is in fact correct and, if so, whether this was clear to Coleman's engineers.

With respect to the adequacy of the warnings on the heater, the heater contained an on-

product warning that stated: "Follow Instructions and Warnings to avoid fires, serious injury, or

death.  Warning – For outdoor or well ventilated construction use only.  Never use inside house,

camper, tent, vehicle, or other unventilated or enclosed area.  This heater consumers air (oxygen).

Do not use in unventilated or enclosed areas to avoid endangering your life."  The parties, and

their respective expert witnesses, dispute whether this warning was adequate because it does not

specifically state carbon monoxide dangers.

The Coleman lantern and tent used by Dowdy and Thomlinson on the night in question

also contained on-product warnings.  The warnings on the tent, which were placed on the inside

and outside door flap and under the tent window, stated:

> "All fuel-burning products use air.  Lack of fresh air can cause poor combustion
> and deadly carbon monoxide.  Never use fuel-burning products in tent without
> providing fresh air into the area.  Provide a fresh air opening at least 2 inches by
> 20 inches 940 square inches).  Make fresh air opening bigger if more than one
> fuel-burning product is in use.  Never use heaters or other fuel-burning products
> while sleeping."

> –AND–

> "WARNING With door and windows closed, this tent is virtually airtight.  All
> fuel-burning products use air.  Lack of fresh air can cause poor combustion and
> deadly carbon monoxide.  Never use fuel-burning products in tent without
> providing fresh air into the area.  Provide a fresh air opening at least 2 inches by
> 20 inches (40 square inches).  Make fresh air opening bigger if more than one
> fuel-burning product is in use."

The parties further dispute whether the evidence shows that Steven Dowdy knew of the

risks of carbon monoxide.  Coleman asserts that Dowdy knew of the results of carbon monoxide

poisoning, citing to evidence that Dowdy found his mother suffering from carbon monoxide

poisoning and knew the details of her recovery.  Coleman also cites to deposition testimony from Dowdy's friends at the campsite in which one friend told Dowdy not to do anything stupid in heating up the tent.  Dowdy responded that he was an experienced camper.  Plaintiffs contend that the evidence does not specifically state anything about carbon monoxide poisoning and that the conversation was vague enough that they could have been referring to fire danger.

The parties dispute whether the court should consider evidence regarding other Coleman heaters.  Coleman made another line of heaters named Focus until 1996 when it switched to the Powermate name.  There have been several cases and tests involving the Focus heaters.  Coleman asserts that the heaters are different and any reference to Focus heaters is irrelevant, but Plaintiffs contend that the heaters are similar in many significant respects.  Moreover, Plaintiffs argue that Coleman has had problems with heaters killing people for longer than just the time it has made Powermate heaters.

 Plaintiffs also claim that at a meeting with the Federal Consumer Product Safety Commission ("CPSC"), Coleman was told to include carbon monoxide warnings on its heaters. There is a dispute as to whether the warning on the heater is sufficient to be a carbon monoxide warning even though it does not state carbon monoxide.  Coleman also argues that the materials from the CPSC meetings are hearsay.

**DISCUSSION**

**<u>Motion for Summary Judgment</u>**

Coleman seeks summary judgment on Plaintiffs' warning claims, product liability claims, and request for punitive damages.

**1.  Warnings Claims**

First, Coleman asks this court to rule that it had no duty to warn Steven Dowdy of the

dangers of carbon monoxide associated with the heater because Dowdy knew of such dangers.  In Utah, there is a recognized defense to strict products liability where there is "knowledge of the defect by the user or consumer, who is aware of the danger and yet unreasonably proceeds to make use of the product, i.e., assumption of the risk."  *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 158 (Utah 1979).  The "assumption of the risk must relate to the defective product and cannot be extended to cover conduct by the user or consumer unrelated to that product."  *Id.*

Coleman argues that Dowdy's personal history of finding his mother with carbon monoxide poisoning and commenting to his wife that he thought they should get carbon monoxide detectors for their home demonstrates that Dowdy was aware of the dangers of carbon monoxide.  This evidence, however, does not relate to whether he knew of the carbon monoxide dangers posed by the heater in question in this case.  Knowing that carbon monoxide dangers exist in your home is not the same as the dangers posed by portable heaters in a tent.  The court does not believe it could rely on this evidence to rule as a matter of law that Coleman had no duty to warn Dowdy.

More specific to the dangers in connection with heating a tent, Coleman also relies on evidence of a conversation Dowdy had with friends at the campsite the night before he died.  Prior to going to bed that evening, Dowdy and his friend talked about how cold it was and that Dowdy intended to heat the tent.  Dowdy's friend told him not to do anything dumb and Dowdy responded that he would not because he was an experienced camper.  Coleman asserts that this conversation demonstrates that Dowdy knew the dangers of carbon monoxide.  Plaintiffs, however, argue that the conversation was vague, neither person mentioned carbon monoxide specifically, and the danger referred to in the conversation with heating the tent could have been referring to fire.  At the summary judgment stage, the court concludes that there is a question of

fact as to Dowdy's knowledge of the dangers posed by using the heater in the tent.  While his friend believes that Dowdy would have known of the dangers of carbon monoxide, they did not specifically refer to carbon monoxide as the danger.  It is possible that Dowdy was concerned with starting a fire.  Therefore, the jury should weigh the evidence, not the court.  The court, therefore, declines to rule as a matter of law that Dowdy assumed the risk based on his knowledge of the dangers of using a propane heater in a tent.

Next, Coleman argues that Plaintiffs' post-sale duty to warn should be summarily dismissed because it could not reasonably identify Steven Dowdy and Darian Thomlinson as end users of the heater.  In *Tabor v. Metal Ware Corp.*, 168 P.3d 814, 818 (2007) , the court emphasized the importance of warning the end user if reasonable, stating there is "a duty to warn the end user only if it has a reasonable means of doing so."  *Id.*

In this case, Paul Thomlinson purchased the heater in 2000 and it had been manufactured in 1997.  Coleman asks the court to rule that it had no post-sale duty to warn because Coleman did not possess a reasonable means of identifying the end users of the heater on the night in question.  Coleman argues that several years had passed since the purchase, the product was being used by someone other than the purchaser, and such products often change ownership multiple times.  Coleman's argument, however, completely ignores the fact that it has an on-product warning on its heater.  With the warning on the heater itself, Coleman is reasonably reaching any potential end user.  There is no issue in this case as to whether the warning was illegible or missing from the heater.  The court, therefore, concludes that there is no basis for finding that Coleman could not reasonably reach end users of the heater.  Rather, the issue in this case is whether the on-product warning was sufficient.

If a duty to warn exists, Coleman argues that it properly discharged its duty with the on-

product warning.  The warning on the heater stated not to use it in unventilated or enclosed areas to avoid endangering your life.  Plaintiffs' expert, however, contends that the on-product warning is insufficient because it does not specifically use the words "carbon monoxide."  Plaintiffs also criticize Coleman's warning because it does not mention that when the heater is placed on a low setting it actually emits greater amounts of carbon monoxide.  Plaintiffs assert that the emission of greater carbon monoxide at lower levels is counterintuitive and should be specifically stated because it would be unknown to end users.  Coleman responds that although the heater does not specifically state "carbon monoxide," there were multiple warnings present, including the warnings on the tent, that do specifically state carbon monoxide.  While these arguments may be convincing to the jury, the court cannot weigh evidence at the summary judgment stage.  The court, therefore, concludes that the sufficiency of the warning is a question of fact to be decided by the jury.

Finally, Coleman argues that any failure to warn was not the cause of the injury and Plaintiffs have not met their burden of showing cause in fact and proximate cause.  "If the event which produced the injury would have occurred regardless of the defendant's conduct," then failure to provide a warning is not the proximate cause of the harm and Plaintiffs' claim must fail.  *House v. Armour of America, Inc.*, 929 P.2d 340, 346 (Utah 1996).  "When an actor knows there is risk, but chooses to act in the face of that risk, any additional warning by the manufacturer serves no purpose in avoiding the harm."  *Id.*

Coleman contends that Steven Dowdy chose to act in the face of the risk and disregarded it.  Coleman further argues that any breach of the duty to warn is not the proximate or factual cause of Darian Thomlinson's death because, but for the acts of Steven Dowdy, Darian Thomlinson would not have died.  The court concludes, however, that because there is a question

of fact as to Dowdy's knowledge of the dangers and the sufficiency of the warnings, the court

cannot rule as a matter of law that the event that produced the injury would have occurred

regardless of defendant's conduct.  There is no way of knowing whether a warning against

placing the heater on a low setting would have changed the events that occurred.  And, under

Utah law, there is a presumption that warnings will be heeded.  *House v. Armour of America,*

*Inc.*, 929 P.2d 340, 346 (Utah 1996).  Therefore, the court denies Defendant's motion for

summary judgment on the duty to warn claims.

**2.  Product Liability Claims**

Coleman next argues that Plaintiffs are unable to satisfy the requirements for their

product liability claims because they have insufficient evidence of defect.  Plaintiffs, however,

assert that the expert reports of Robert Engberg and Gary Hutter present solid evidence that the

design of the heater is defective and that it was defective when it left the Coleman plant.  Both

experts have been involved in numerous similar carbon monoxide death cases involving various

Coleman heaters.

To meet their burden of proof under Utah law for strict liability, Plaintiffs must show: (1)

that the product was unreasonably dangerous due to a defect or defective condition; (2) that the

defect existed at the time the product was sold; and (3) that the defective condition was a cause

of the plaintiff's injuries.  Utah Code Ann. § 78B-6-703.  "Unreasonably dangerous" is defined to

mean "that the product was dangerous to an extent beyond which would be contemplated by the

ordinary and prudent buyer, consumer, or user of that product in that community considering the

product's characteristics, propensities, risks, dangers, and uses together with any actual

knowledge, training, or experience possessed by that particular buyer, user, or consumer." *Id.* §

78B-6-702.

Plaintiffs' warnings and negligence claims also require a showing of defect. "Products liability always requires proof of a defective product . . . Whatever the theory, the defendant's liability is for the defective product and not merely for any underlying negligence." *Bishop v. Gentec Inc.*, 48 P.3d 218, 225-26 (Utah 2002).

First, Coleman argues that Plaintiffs cannot demonstrate that the heater is defectively designed because Plaintiffs do not have sufficient evidence of any feasible alternative design. Plaintiffs' experts suggest the incorporation of certain safety devices, such as an ODS and relocating the thermocouple in front of the burner screen like other manufacturers. While Coleman disputes whether these alternatives are feasible or have been adequately tested, Plaintiffs assert that their experts have not only theorized safer designs, but incorporated them, tested them, and proven their reliability.

In 1982, Coleman engineers tested a Valor unvented room heater equipped with an ODS. This test showed that the ODS functioned as designed to shut down the heater when oxygen levels declined. Coleman claims that no high pressure propane heater included an ODS in 1996 nor now. However, Plaintiffs argue that since 2002, several manufacturers have sold propane heaters that incorporate the ODS safety device. Coleman also asserts that Plaintiffs' expert did not test his ODS theory and the CPSC has found that ODS technology cannot be incorporated into bulk-mount heaters, such as the heater in this case. Plaintiffs, however, state that their expert, Dr. Hutter, has attached an ODS onto three different Coleman heater models and tested their ability to shut down the heater. Plaintiff's expert also concluded that it would cost $20-25 per unit to implement an ODS on the design.

There is a lot of conflicting evidence with respect to whether an ODS is employed on similar heaters in the industry and whether the design is superior. The court concludes that while

Coleman may take issue with aspects of Plaintiffs' alternative design, there is enough evidence in the record supporting Plaintiffs' design that it is for the jury to hear and decide the issue.

With respect to Plaintiffs' theory that a thermocouple should be placed in front of the burner face, Coleman argues that Plaintiff has not proven that it is the superior design. Although other heaters on the market place the thermocouple in front, there is no evidence that they do so in order for it to serve as a low oxygen shut down device. Plaintiffs assert that while other manufacturers may not place the thermocouple in front of the burner for purposes of shutting it off when low levels of oxygen are reached, the effect of that design is to do just that. Plaintiffs' experts state that it is obvious from testing these other models that the design works to shut off the heater. Prior testing conducted by Coleman engineers demonstrates that Coleman knows that its competitors use that design and that the heater shuts off in such a manner. Plaintiffs also point out that Coleman knows that its competitors' heaters are not causing carbon monoxide deaths. Coleman's concern that placing the thermocouple in front causes unintended shut-offs does not demonstrate that Plaintiffs' alternative design is necessarily inferior, especially in relation to the facts of this case. Plaintiffs have presented a sufficiently alternative design for a jury to decide whether that design is superior.

Even if Plaintiffs can demonstrate a defect, Coleman argues that Plaintiffs have not developed enough evidence that the subject heater can or did produce the carbon monoxide necessary to cause this incident. Coleman claims that Plaintiffs' testing of the heater in a one-cubic-foot chimney chamber is flawed and turns the testing into mere speculation. Plaintiffs contend that Coleman's assertion is contradicted by their experts and abundant evidence in the record of testing conducted on similar heater models. While there may be aspects of the testing that can be criticized, there is still evidence in the record that the heater can produce large

amounts of carbon monoxide.  The CPSC has also investigated Coleman heaters similar to the one in this case.  The CPSC test was in a 100 cubic foot chamber, and the heater continued to produce deadly amounts of carbon monoxide.   Plaintiffs also argue that Coleman's own testing confirms that the heaters produce deadly amounts of carbon monoxide.  Based on this evidence, Coleman is not entitled to judgment as a matter of law.  A jury must weigh the evidence at trial. Accordingly, Coleman's motion for summary judgment on Plaintiffs' product liability claims is denied.

**3.  Punitive Damages**

Coleman asks this court to conclude that Plaintiffs are not entitled to punitive damages as a matter of law.  Under Utah law, punitive damages are recoverable if Plaintiffs are awarded compensatory damages and show by clear and convincing evidence that Coleman's conduct "manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B-8-201.  Coleman asserts that Plaintiffs do not have enough evidence to meet the high standard required for punitive damages because Coleman's conduct conformed to industry standards and customs.  Plaintiffs, however, contend that Coleman's conduct does not conform to the industry standard and the evidence in this case demonstrates that before Coleman manufactured the heater in 1996, it had evidence of how to design, manufacture, and sell a safe propane heater.

First, the parties dispute whether Coleman meets industry standards.  Plaintiffs point to evidence that Coleman engineers conducted testing in 1990 showing that the bulk mount propane heaters of Coleman's competitors would flame out or shut down before producing dangerous levels of carbon monoxide.  Plaintiffs' experts assert that Coleman ignored this testing and continued with its own design even though several deaths had occurred with its design and deaths

12

were not occurring with its competitors' heaters.  This court concludes that this evidence presents a disputed issue of fact as to whether Coleman's heater meets the industry standard.

Plaintiffs also assert that there was substantial evidence in 1996 that Coleman's warning was inadequate unless it warned specifically about carbon monoxide.  The CPSC investigated multiple carbon monoxide deaths in 1992-93 and pressured Coleman to do a carbon monoxide warning on the heaters, which it did from 1993-1996.  Coleman also placed a carbon monoxide warning notice in an advertisement in 13 camping and hunting magazines.  Since that time, however, Coleman has failed to mention carbon monoxide specifically on its bulk mount heater warning and has done no more magazine notices.  Plaintiffs contend that by reverting back to warnings used before the CPSC asked them to add specific carbon monoxide warnings shows an indifference to the warning.  Plaintiffs further argue that Coleman is a recidivist because countrywide there have been dozens of cases like the one in this court involving deaths from carbon monoxide poisoning.  The court concludes that this is enough evidence for the jury to consider punitive damages at trial.  Accordingly, Coleman's motion for summary judgment on punitive damages is denied.

## Motions to Strike

### 1.  Coleman's Motions to Strike Testimony and Opinions of Engberg and Hutter.

Engberg is a mechanical engineer and is an expert for Plaintiffs with respect to the design of the heater.  Hutter has a doctorate degree in environmental occupational health studies and a bachelor's degree in mechanical engineering and he is employed as an expert on safer alternative design and inadequate warnings.

Coleman first challenges Engberg's and Hutter's qualifications to testify as experts in this case.  Coleman argues that Engberg and Hutter have testified in several trials against it and most

of their experience with the heaters is in the litigation context, not the actual manufacturing context.  The court finds no basis for finding Engberg or Hutter unqualified based on their involvement in prior litigation.  Both have the educational background necessary to opine on the issues.

Coleman also contends that Engberg's and Hutter's opinions and testimony should be stricken because their testing is not based on reliable methods.  The issue, therefore, is whether their methods are so unreliable as to be precluded under *Daubert* or whether their methods should more appropriately be admitted and subject to cross examination.  If the witness is qualified as an expert, the court's gatekeeper role requires a determination as to whether the proposed expert testimony is both (1) reliable and (2) relevant.  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005).  "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid.  Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue."  *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir.), *cert. denied*, 123 S. Ct. 697 (2002).

Coleman argues that the only work Engberg and Hutter undertook in their attempt to prove the heater was the source of the carbon monoxide in this incident was an unreliable test that lacked professionalism.  Coleman asserts that there is no video of the testing, no written protocol, few photographs, and no control tests prior to placing the heater in a small chimney contraption.  In addition, Coleman takes issue with the use of the chimney contraption to replicate the environment in the tent on the night in question and asserts that the test should have been conducted in a similar sized tent.

The court agrees that, ideally, the testing would have been conducted in a tent similar to

the one at issue in the case.  Plaintiffs, however, argue that Coleman's use of the term "chimney contraption" is a characterization made only by Coleman's attorneys to make the test sound unreliable.  Plaintiffs contend that these arguments demonstrate only that Coleman's attorneys are incompetent to understand and challenge the mechanical operation of the testing.  The test was done using a fume hood.  Moreover, Hutter's report states that the testing was not meant to duplicate the actual operating conditions within the tent.  Hutter states that there have been numerous past tests of Coleman heaters in tents and other enclosures.  His report identifies that the object of the testing with the fume hood was to prove that the heater, like other Coleman heaters, is capable of producing deadly amounts of carbon monoxide.  The fume hood allowed the experts to measure the heater's burner under various conditions of excess combustion air and oxygen levels.

Plaintiffs experts also scientifically excluded other possible sources of carbon monoxide on the night in question.  The experts tested the Coleman lantern that was also in the tent and determined that it does not produce significant amounts of  carbon monoxide but may have contributed some small amount to a depletion of oxygen.  There is no other credible evidence as to another source of the carbon monoxide.

While the court understands Coleman's concerns that Plaintiffs' did not test the heater in a tent, Plaintiffs assert that the test in question was related only to demonstrating whether the heater was capable of producing high levels of carbon monoxide in various conditions.  The test shows that the heater in question was capable of being the source of carbon monoxide.  Plaintiffs state that there are other tests of similar heaters in similar tents that show that such heaters create a deadly environment in a tent.  Plaintiffs experts also tested the only other potential source of carbon monoxide in the tent, the lantern, and scientifically concluded that it was not the source.

Plaintiff's decision to rely on other test results of similar heaters in tents and the test of the heater at issue in this case with the fume hood does not appear to be so unreliable as to require an exclusion of the testimony altogether under *Daubert*.

Although Coleman criticizes Plaintiffs' test for not being in a tent, Coleman does not argue that Plaintiffs had to test the heater in a tent to meet *Daubert* requirements.  Coleman asserts that Plaintiffs' experts could have conducted an "air free" test to measure the carbon monoxide output during normal operation and placed a hood above the heater to collect carbon monoxide.  Coleman states that a calculation is then used to determine the amount of carbon monoxide.  Coleman, however, does not explain how this "air free" test with a hood differs from the fume hood and calculations used by Plaintiffs' experts.  Coleman's acknowledgment that testing within a tent is not required also supports a conclusion that the method of testing used by Plaintiffs' experts satisfies *Daubert* and should merely be subject to cross examination.

Coleman also seeks to exclude Hutter and Engberg's opinions on alternative safe designs. Engberg has attached an ODS onto three different Coleman heater models, all of which he explains are similar to the heater model at issue in this case.  Engberg and Hutter have tested these heaters and concluded that the ODS is an effective safety shut down device.  Plaintiffs also argue that their experts conclusion that attaching an ODS to the Coleman heaters was feasible is supported by evidence that several other manufacturers incorporate an ODS.   The court finds no basis under *Daubert* for excluding Engberg's and Hutter's opinions as to the use of an ODS.

Similarly, the court finds no basis for excluding the experts' opinions on the relocation of the thermocouple.  The experts' opine that placing the thermocouple in front of the burner screen acts as a safety shut down device.  These opinions are based not only on the experts testing, but testing by Coleman as well.  Engberg has also moved the thermocouple on a similar

Coleman Powermate heater and tested the effectiveness of the altered heater.  The court

concludes that there is no basis for excluding this evidence under *Daubert*.

Coleman also seeks to strike Hutter's opinions regarding the warnings because it does not

consider the fact that other warnings were present in the tent.  This argument, however, is more

appropriate for cross examination.  Coleman also argues that Hutter cannot testify as to the

meaning of CPSC documents.  The CPSC documents speak for themselves.  Any

characterization of their meaning can be subject to cross examination.

Finally, Coleman argues that Hutter is not a toxicologist and cannot give specialized

toxicological opinions.  Coleman never gets more specific in this objection.  Accordingly, the

court finds no basis for striking alleged toxicologist opinions that Coleman has not identified.

Accordingly, the court denies Coleman's motions to strike the testimony and opinions of

Engberg and Hutter.

## 2.  Plaintiffs' Motion to Strike Testimony and Opinions of Nick Marchica and Roy Deppa

Marchica and Deppa are former employees of the Consumer Product Safety Commission

("CPSC").  Plaintiffs move to strike their testimony, arguing that it attempts to give background

information about CPSC documents and tries to add the intent of the employees who drafted the

documents without any first hand knowledge.  As stated above, the CPSC documents speak for

themselves.  The court agrees that foundation will need to be laid with respect to the witnesses'

knowledge.  But, as with Hutter's testimony as to the CPSC documents and actions, any

characterization of the documents and actions can be subject to cross examination. Therefore, the

court denies Plaintiff's motion to strike.

## 3.  Plaintiffs' Motion to Strike Testimony and Opinions of Richard J. Roby

Plaintiffs move to strike the testimony of Coleman's expert, Richard J. Roby.  Roby

opines that the heater could not have been the source of the carbon monoxide poisoning that killed Dowdy and Thomlinson.  He states that the heat generated by the heater would have to reach such high levels that the occupants could not have remained in the tent.  Roby tested the heater in a tent and a temperature of 150 degrees was achieved after just twelve minutes.  Roby then concludes that there must have been some other unidentified source of carbon monoxide. Plaintiffs argue that his testimony should be stricken because there is no factual support for Roby's alternative source theory.

Roby opines that a blue Dodge truck in one of the pictures may have been close enough to the tent to create carbon monoxide if it was in operation during the night.  However, there is no evidence of whether the truck was ever running during the night.  There is also no evidence regarding any wind patterns that would impact carbon monoxide released from the truck.  Roby has done no testing of an alternative source and has not identified a reasonable alternative source by merely pointing to the presence of vehicles nearby.  Roby's opinion that any of those vehicles could be he source of the carbon monoxide in the tent involves too many layers of speculation and assumptions to pass the reliability and relevance standards of *Daubert*.  509 U.S. at 590. Accordingly, the court concludes that Roby's alternative source theory is not supported by the facts in this case and must be precluded under *Daubert*.

The court, however, will allow Roby to testify as to his theory that the heater could not be the source of the carbon monoxide in the tent.  Plaintiffs' concerns as to the reliability of Roby's opinion that the heater could not be the source of the carbon monoxide can be addressed on cross-examination.  These rulings will apply equally to Coleman's expert Jamie L. McAllister if she testifies as to these same issues instead of Roby.

**4. Coleman's Motion to Exclude Plaintiffs' Irrelevant and Inadmissible Exhibits.**

Coleman moves to strike many of the exhibits submitted by Plaintiffs in connection with their opposition to Coleman's motion for summary judgment and motions to strike.

First, Coleman moves to strike ten judicial decisions by other district courts. These decisions, however, were provided to the court as persuasive legal precedent, not as evidence. It is customary, at least in this District, for counsel to attach relevant case law as exhibits to their legal memoranda. Because Plaintiffs have no intention of trying to admit these rulings into evidence, there is no basis for striking them.

Next, Coleman moves to strike the affidavits of Engberg and Hutter because it claims they are not signed properly. Plaintiffs, however, submitted the affidavits in a format they believed to be required by the court's CM/ECF system. Plaintiffs have filed a certification that they have in their possession the signed and notarized affidavits. The court, therefore, finds no basis for striking the affidavits.

Coleman also moves to strike documents from the CPSC because it claims that the documents are not relevant to Plaintiffs' claims. The CPSC documents do not reference the specific heater at issue in this case. However, Plaintiffs experts have explained in their reports that the heaters are substantially similar in the aspects relevant to the issues in this case. The fact that the CPSC investigated other similar heater models may be relevant to the present case. Coleman contends that to the extent that any CPSC evidence is marginally relevant, the probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and considerations of delay and waste of time. For purposes of summary judgment, the court finds no basis for striking the documents submitted. However, prior to trial, the court will allow both parties an opportunity to address the admissibility of specific documents identified by either party as trial exhibits. Coleman's concerns regarding specific hearsay portions of documents can also

be addressed at that time.  At present, the documents appear to the court to be admissible business records.

Furthermore, Coleman seeks to strike exhibits that relate to other incident/product evidence because Plaintiffs are required to establish that these other incidents are "substantially similar" to the subject incident.  Courts permit the introduction of substantially similar incidents "in products liability cases to demonstrate the existence of a defect, to prove notice, or to refute testimony given by defense witnesses."  *C.A. Assocs. v. Dow Chemical Co.*, 918 F.2d 1485 (10th Cir. 1990).  In *Four Corners Helicopter, Inc. v. Turboneca*, 979 F.2d 1434 (10th Cir. 1992), the court found prior incident evidence relevant even though the incidents involved two different types of engines.  *Id.* at 1439.  The court explained that no two cases are exactly alike and the differences in that case went to the weight of the evidence and not the admissibility.  *Id.*

Plaintiffs' experts have explained how the Coleman heaters in these other incidents are substantially similar to the heater in this case.  The heaters have the same alleged design defects that allegedly generate dangerous amounts of carbon monoxide without any type of safety shutdown system.  Other courts have also found that the various Coleman heaters at issue in these types of cases are substantially similar.  The facts of the other incidents also show that these heaters that Coleman intended to be outdoor heaters were used in enclosures without sufficient fresh air ventilation.  In addition, the other incidents involved similar theories of liability. Therefore, the court finds that the other incident evidence is relevant to show the existence of a defect, notice to Coleman, and punitive damages.  Accordingly, the court finds no basis for striking this evidence.  The differences go to the weight of the evidence and not to its admissibility.

## CONCLUSION

Based on the above reasoning, the court concludes that (1) The Coleman Company, Inc.'s Motion for Summary Judgment [Docket No. 63] is DENIED; (2) The Coleman Company, Inc.'s Motion to Strike the Testimony and Opinions of Robert Engberg [Docket No. 66] is DENIED; (3) The Coleman Company, Inc.'s Motion to Strike the Testimony and Opinions of Gary Hutter [Docket No.69] is DENIED; (4) Plaintiffs' Motion to Strike the Testimony and Opinions of Marchica and Deppa [Docket No. 82] is DENIED; (5) Plaintiffs' Motion to Strike the Testimony and Opinions of Richard J. Roby [Docket No. 84] is DENIED IN PART AND GRANTED IN PART; and (6) Defendant's Motion to Strike Plaintiffs' Irrelevant and Inadmissible Exhibits Offered in Response to the Coleman Company, Inc.'s Motion for Summary Judgment and In Opposition to The Coleman Company, Inc.'s Motions to Strike the Testimony and Opinions of Robert Engberg and Gary Hutter [Docket No. 98] is DENIED.

DATED this 12th day of September, 2012.

BY THE COURT:

Dale A. Kimball,
United States District Judge